# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CALLAN CAMPBELL,** | : | **Civil Action No. 1:11-1215** |
| **Plaintiff,** | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | |
| **HOLLY F. FAWBER, and** | : | |
| **GENERAL MOTORS** | : | |
| **CORPORATION,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the court in the above-captioned matter are two motions for partial summary judgment, filed by defendant Motors Liquidation Company GUC Trust (formerly known as General Motors Corporation, and hereinafter referred to as "GM") (Doc. 14), and plaintiff Callan Campbell ("Campbell") (Doc. 11), and a motion for summary judgment (Doc. 17) filed by GM. The motions have been fully briefed, and are ripe for disposition.

## I. <u>Background</u>

### A. <u>The Automobile Accident</u>

This matter arises out of a single vehicle car accident that occurred on August 17, 2004, in Wiconisco Township, Pennsylvania. Defendant Holly Fawber ("Fawber") was driving a 1996 GMC Jimmy sport utility vehicle, in which the plaintiff, Callan Campbell, was a passenger. At the time, Fawber and Campbell were 16 and 18 years old, respectively. Campbell was seated in the right front seat of the vehicle, and was wearing her seatbelt. Fawber, while making a lefthand turn from Pottsville Street onto Machamer Avenue, lost control of the vehicle. The

Jimmy swerved and rolled in a driver-side leading fashion, meaning that the passenger's side rotated over the driver's side in the roll. The vehicle came to rest on its roof.

Campbell suffered catastrophic injuries as a result of the accident. Though the extent and precise nature of her injuries are disputed, the parties generally agree that Campbell suffered fractures of her C6 and C7 vertebrae, which damaged her spinal cord and rendered her quadriplegic.

B.    The Bankruptcy Proceedings

Campbell commenced this action on August 31, 2005, by filing a complaint in the Court of Common Pleas of Lackawanna County, Pennsylvania, alleging negligence against Fawber, and strict liability and negligence against GM. The matter remained exclusively in state court until June 1, 2009, when General Motors Corporation declared bankruptcy and commenced voluntary Chapter 11 filings in the United States Bankruptcy Court for the Southern District of New York, at which point all proceedings and judicial actions against GM were automatically stayed. See 11 U.S.C. § 362. On July 5, 2009, the Bankruptcy Court approved GM's asset sale motion. Upon consummation of the asset sale, GM changed its name to Motors Liquidation Company. The Bankruptcy Court established November 30, 2009, as the deadline for filing proofs of claim against Motors Liquidation Company, based upon pre-petition claims. See 11 U.S.C. § 502(b)(9). Campbell filed her proof of claim on October 26, 2009. On March 28, 2011, the Bankruptcy Court established the GUC Trust pursuant to the Motors Liquidation Company GUC Trust

Agreement. Campbell's claim was then transferred to the GUC trust, making the GUC Trust GM's successor in this matter. On May 31, 2011, the Bankruptcy Court entered an order modifying the automatic stay under § 362. The Court lifted the stay to the extent necessary to allow this action to proceed to final judgment or settlement.

GM removed to federal court on June 27, 2011. <u>See</u> 28 U.S.C. § 1334(b) (granting district courts subject matter jurisdiction over cases "arising in or related to" bankruptcy proceedings). By order dated July 22, 2011, this court established filing deadlines for Campbell's amended expert reports, GM's expert reports, and Campbell's rebuttal reports, for depositions of all experts, and for filing dispositive motions.

## II. **Campbell's Expert Witnesses**

GM has moved for summary judgment on the grounds that Campbell's expert witness testimony is inadmissible under Federal Rule of Evidence 702. Rather than challenge the reliability of each expert's testimony in depth, GM bluntly asserts that all of their opinions are unreliable for lack of sufficient "testing." Accordingly, it is appropriate for the court to discuss at some length the processes and methodologies employed by four of Campbell's expert witnesses.

### A. Dr. Michael Freeman

Campbell retained Dr. Michael Freeman to provide an opinion on whether, and to what degree, Campbell's cervical spine injuries were caused by the collapse of the Jimmy's roof. Dr. Freeman has a Ph.D. in public health, with a specialization

in epidemiology, and an M.P.H. in epidemiology and biostatistics. (Freeman CV, Doc. 27-3 at 2). He serves currently as an affiliate professor of epidemiology at Oregon Health & Science University School of Medicine, in the Department of Public Health and Preventive Medicine. (Id.) Dr. Freeman teaches courses in forensic and trauma epidemiology, with a focus on motor vehicle crash injuries, to graduate medical students, M.P.H. and Ph.D. candidates, and doctors who practice emergency medicine and trauma surgery. (Freeman Report, Doc. 19-13 at 2).

Dr. Freeman has extensive experience studying rollover crashes and car accident-related fatalities, both as a field investigator and analyst, and as a scientist. He is a Special Deputy Sheriff vehicular homicide investigator for the vehicular homicide law enforcement team of Clackamas County, Oregon, and has consulted with the Medical Examiner Division of the Oregon State Police on the subject of forensic trauma epidemiology. (Id. at 3). Dr. Freeman is also an accredited crash reconstructionist with the Accreditation Commission for Traffic Accident Reconstruction. (Id.) He has published over 120 scientific papers, abstracts, books, and book chapters, primarily on the topic of motor vehicle crash-related injuries and fatalities, crash reconstruction, injury causation analysis, biomechanics, and forensic epidemiology. (Id.) He has served more than 300 times as an expert witness on these topics in state and federal courts, as well as in several foreign countries. (Id.)

Dr. Freeman performed four statistical studies in order to evaluate the strength of association between the degree of roof crush and the odds of sustaining

a serious injury. These studies examined data from the National Automotive Sampling System – Crashworthiness Database ("NASS-CDS"). (Id. at 9). The NASS-CDS is a data set gathered from approximately 5,000 motor vehicle crashes each year. Trained crash investigators and medical examiners log over 800 variables for each crash, including weather conditions, road conditions, the extent of injuries to occupants or pedestrians, and damage to the vehicle. (Id. at 9).[1]

Dr. Freeman's first two studies considered the head and neck injury outcome and risk of death as a result of roof crush, controlling for other accident variables that could affect risk of injury. The third study considered the odds of serious head and neck injury versus no injury for occupants in the same vehicle and depending on the degree of roof crush, controlling for other variables, but matching for roll severity and the roof's strength-to-weight ration ("SWR"). The fourth study considered the risk of serious cervical spinal injury, relative to the occupant's position in the vehicle, depending on whether the vehicle sustained greater than, or less than, six inches of roof crush.

Dr. Freeman examined data from single vehicle rollover crashes involving occupants ages 13 or over who were sitting in the front-right or front-left seats of a car, minivan, pickup truck, or SUV. (Id. at 11). The studies considered occupants

---

[1] To be recorded in the NASS-CDS, a crash must meet several criteria: a police report must have been completed; the crash must have occurred within a primary sampling unit; the crash must have involved at least one passenger car, van or light truck; and at least one vehicle must have been towed from the accident site. (Id. at 10).

for whom an intrusion of a "specified vehicle component" occurred at their seating position, and who suffered a head, neck or spine injury ("Type M occupants"), and those for whom the specified component did not cause an injury, or the injury caused was not related to the head, neck or spine ("Type O occupants"). The studies excluded major vehicle fires, vehicle immersions, occupants seated in the center seat or in the second row, arrested rollover crashes, and end-over-end rollovers.

Applying these criteria, Dr. Freeman abstracted 3,088 vehicle occupants, 1,118 of whom were Type M occupants and 1,970 of whom were Type O. Within the Type M group, occupants were removed if death, air bag deployment, seatbelt use or roll direction were unknown, or if the vehicle was a convertible. (Id.) This left 960 Type M occupants to comprise the "cohort study," wherein their "putative injury exposure level (degree of roof crush) was gathered and categorized, and the outcome of interest was head and neck injury presence and severity." (Id.) The Type M occupants were then classified according to the abbreviated injury scale ("AIS") used in the NASS-CDS, which broadly classifies injury severity as follows: 0: no injury; 1: minor; 2: moderate; 3: serious; 4: severe; 5: critical; 6: maximum; 7: injured, unknown severity. The 0 and 7 categories were removed. The NASS-CDS further classifies injured occupants according to the area of the body injured: 1: head; 2: face; 3: neck (referring to all tissue between the head and thorax, but excluding the spinal column); 4: thorax; 5: abdomen; 6: spine (referring to the cervical, thoracic, and lumbar regions of the spinal column); 7: upper extremity; 8:

6

lower extremity; 9: unspecified.  Dr. Freeman calculated a composite score of

overall injury severity, called the New Injury Severity Score ("NISS"), which

consists of the sum of the squares of the AIS scores of an occupant's three most

severe injuries.  (Id.)  Dr. Freeman further refined the scoring mechanism by

evaluating only injuries to the head or neck (the "HN-NISS").

Controlling for other variables, Dr. Freeman determined that roof crush of

greater than six inches was associated with increased odds of head and neck injury

and death.  (Id. at 23).  Specifically, Dr. Freeman determined that the odds of a

serious cervical spine injury among vehicle occupants with greater than six inches

of roof crush at their seating location were 817% greater than those at seating

positions with less than six inches of crush.  In each statistical model, roof crush

was a substantially stronger predictor of serious injury than any other variable

except roll arc side and seat position.

B.     Dr. Carl Nash

Campbell retained Dr. Carl Nash to testify on the causal relationship

between the Jimmy's roof structure and Campbell's injuries.  Dr. Nash received a

Ph.D. in Physics from the University of North Carolina at Chapel Hill.  (Nash

Report, Doc. 19-8 at 2).  He served as Confidential Special Assistant to the National

Highway Traffic Safety Administration ("NHTSA") for fifteen years, where he

oversaw rulemaking programs, directed the agency's planning and evaluation

activities, and directed the agency's crash investigation and data collection

activities.  (Id.)  Since his retirement from the NHTSA, Dr. Nash has served as an

adjunct professor of engineering at the National Crash Analysis Center at George Washington University, conducting research and teaching graduate engineering courses on motor vehicle safety. (Id.) Dr. Nash has conducted investigations and reconstructions of more than twenty rollover crashes, and has been an expert witness numerous times. He has been published and given major presentations in the field of motor vehicle safety. (Id.)

In his report, Dr. Nash concluded that "the roof structure of the 1996 GMC Jimmy involved in this rollover was defectively weak and unreasonably dangerous beyond the contemplation of the average consumer," and that the structural failure of the roof was the primary cause of Campbell's injuries. (Id. at 3). Dr. Nash further opined that "adopting alternative design approaches and materials that were technologically feasible and available" at the time of the GMC's design could have prevented Campbell's injuries. (Id.) He considered, among many other sources, a reconstruction of the accident, undertaken by Steven M. Schorr, as well as the police report of the accident, which was prepared by Trooper Brian M. Knorr of the Pennsylvania State Police.

In reaching his conclusions, Dr. Nash employed standard scientific systems analysis techniques. (Id.) Systems analysis "considers all aspects of the automotive system through the full crash sequence," and allows an analyst to "assess and determine whether some aspect of a vehicle's design, construction and performance is defective and caused the crash injuries." (Id.) Systems analysis involves consideration of "crash statistics, vehicle dynamics, occupant kinematics, injury

susceptibility and mechanism, crashworthiness, and occupant protection." (<u>Id.</u>) It also involves testing, assessing safety defects and their causal relationship with crashes and injuries, and determining the foreseeability of consequences.

Dr. Nash describes some of the testing methods used to determine roof strength. The first is the Federal Motor Vehicle Safety Standard 216 ("FMVSS 216"), which Dr. Nash describes as "very old and limited." (<u>Id.</u> at 12). This test is conducted by applying a large, flat platen to the roof of the vehicle, over the A-pillar. The platen is placed at a 5° pitch angle and a 25° roll angle. (<u>Id.</u>) Force is then applied. To meet the standard, a light truck with a gross vehicle weight under 6,000 pounds must resist the force of the platen to at least 1.5 times its weight, before crushing 5 inches. Among other weaknesses of this test, Dr. Nash notes that only one side of the vehicle is tested, whereas in actual rollovers, both sides of a vehicle will strike the ground. (<u>Id.</u>) Dr. Nash also notes that the required force is "unrealistically low," because actual SUV rollovers typically subject a roof to three to four times the vehicles' weight. (<u>Id.</u> ("The low force permits manufacturers to use the strength of the windshield (which virtually always fails in a rollover) to contribute to crush resistance.")).

Dr. Nash also discusses a two-side roof strength test, which Xprts LLC performed on a 1995 Chevrolet S-10 Blazer, on March 25, 2004. (Xprts Blazer Test, Doc. 27-5 at 4). The 1995 Blazer has the same roof structure as the 1996 Jimmy. This test, known as the M216 test, differs from the FMVSS 216, and "better assess[es] the rollover roof crush performance of vehicles." (Nash Report, Doc. 19-8

9

at 13).  The M216 test of the Blazer was conducted by applying a platen first to one side of the vehicle's roof at a roll angle of 25°, and a pitch angle of 10°.  (Id. at 13-14). Force was then applied to test the ability of the roof to withstand a rollover crash. (Id.)  Then the second side was tested at the same roll and pitch angles.  (Id.)  The Blazer's first side roof crush resistance was 4,657 pounds, but only 2,943 pounds after the windshield failed at 3 inches of crush.  (Id.)  The second side performance was similar, with a maximum resistance of 4,656 pounds, and 3,114 pounds after the windshield failed.  (Id.)  According to Dr. Nash, this is not even sufficient to support the vehicle's own weight.  (Id.)

Dr. Nash obtained and examined a 2000 Chevrolet Blazer, also a "sister" of the 1996 Jimmy, and used a female model of nearly the same height as Campbell (five feet, five inches tall, as compared to Campbell's five feet, five and a half inches) to estimate Campbell's seated height and headroom.  (Nash Report, Doc. 19-8 at 10). He found that when the model sat normally in the front right passenger seat, she had about seven inches of headroom.  (Id.)  When she sat upright, she had between four and five inches of headroom.  (Id.)  The Jimmy involved in Campbell's crash suffered three to four inches of residual intrusion over the driver's seat, and about six to eight inches over the front passenger seat.  (Id. at 8).

Dr. Nash also refers to stability testing conducted by the NHTSA on a 2001 Chevrolet Blazer S-10, which like the previous Blazers, is a sister vehicle of the 1996 Jimmy.  That test found that the Blazer had a static stability index – a measurement of rollover propensity – of 1.09, which would give the Blazer a rollover rating of two

10

out of five stars under the NHTSA's New Car Assessment Program. (Id. at 11). The NHTSA indicated that this measurement applied to Blazer S-10s from model years 1991-2003. (Id.)

Finally, Dr. Nash studied alternate designs that could improve roof crush resistance, in particular focusing on the Volvo XC-90. (Id. at 16). He reviewed a variety of tests conducted on the XC-90, concluding that it performed uniformly well, and dramatically better than the Jimmy. (Id.)

C.    Dr. Nicholas Perrone

Campbell retained Dr. Nicholas Perrone to offer an opinion on the strength of the Jimmy's roof, as well as its propensity to rollover. He holds a Ph.D. in applied mechanics from the Polytechnic Institute of Brooklyn. (Perrone CV, Doc. 27-8 at 3). Dr. Perrone has served as a thesis advisor for graduate students at Catholic University, and on the doctoral committee at American University. (Id.) He has taught courses on engineering physics and mechanics, and strength of materials, and limit analysis of structures, among others. (Id.) He has edited or co-edited twelve books on the subjects of biomechanics and structural mechanics, (id. at 7), and has published upwards of 70 academic articles on various engineering and biomechanics subjects, including articles about crashworthiness and rollover probability. (Id. at 12-19).

Dr. Perrone concluded that the "1996 Jimmy vehicle had an incredibly weak roof structure combined with a high propensity to rollover," and that these weaknesses directly caused Campbell's injuries. (Perrone Report, Doc. 19-5 at 5).

11

In forming this opinion, Dr. Perrone created a reconstruction of Campbell's crash. Campbell's accident took place at approximately 4:45 in the afternoon on a dry road with no adverse weather conditions. (Id. at 4). The section of Machamer Avenue upon which the accident occurred is on a hill. (Id.) It has a downgrade of approximately 8% at the top, and about 4% where the accident occurred, 200 feet from the top of the hill. (Id.) The accident occurred when Fawber turned left onto Machamer Avenue at a speed of 30 to 35 miles per hour. (Id.) Braking into the turn, Fawber turned rapidly to the left and then rapidly to the right, staying on the road. (Id.) While turning to the right, the vehicle sustained an untripped rollover. All of the occupants were wearing their seatbelts. After the accident, while the Jimmy was on its roof, both Fawber and the third occupant, Nicole Maurer ("Maurer"), were able to exit the vehicle, but Campbell was not due to "almost immediate paralysis." (Id.)

Dr. Perrone opines that Campbell's injuries were caused by roof collapse. The roof over Campbell's seat was significantly more compromised than the roof over the other occupants. (Id. at 5). He concludes that if GM's "diving" theory, discussed at length *infra*, were meritorious, then Maurer should also have been significantly injured because she also was on the trailing side of the vehicle, and weighed nearly twice as much as Campbell. (Id.) Maurer, however, walked away from the accident.

Dr. Perrone also considers the impact that the Jimmy's stability had on the accident. He opines that the Jimmy's Static Stability Factor ("SSF") of 1.09,

produces a 36% probability of an untripped rollover.  He recommends that the track width be increased approximately five inches, which would raise the Jimmy's SSF to 1.2, with a 22% chance of an untripped rollover.

     D.    <u>Dr. James Pugh</u>

Dr. James Pugh is Campbell's biomedical engineer.  He has a Ph.D. in biomedical engineering, and a B.S. in metallurgy and materials, both from MIT. (Pugh CV, Doc. 27-11 at 2).  He is currently a professor at the Cooper Union School of Engineering in New York, and previously held professorships at other universities, including the University of Washington and New York University.  (<u>Id.</u>) He has taught courses in the areas of applied mechanics, materials science, biomechanics, biomaterials, ergonomics, occupational health and safety, strength of materials, and orthopaedic engineering. (<u>Id.</u>)  He has published 73 technical articles in engineering and scientific journals, and delivered more than 50 lectures nationally and internationally.

Dr. Pugh inspected the Jimmy and examined the reports of Drs. Nash and Perrone, and Steven M. Schorr.  (Pugh Report, Doc. 19-7 at 2).  Dr. Pugh observes that Campbell "was 'nutcracked' between the collapsing roof structures and the seat when the vehicle was in the largely inverted configuration." (<u>Id.</u> at 3).  He opines that it was economical and feasible to design the Jimmy so that dynamic roof collapse could be limited to five to seven inches, which would allow an occupant to resist injury due to a collapsing roof because the human head-spine complex is inherently elastic and compliant.  He explains that injuries could be avoided if "the

13

body is adequately restrained by the belt system so that it remains largely confined to the normal seating position." (Id.) He further opines that the "residual or static" roof intrusion of the Jimmy was between six and eight inches, and that the dynamic intrusion was 30-50% greater. (Id.) Thus, he believes that the dynamic deflection to which Campbell was subjected was as much as twice the biomechanically-allowable maximum of five to seven inches that her body could resist. (Id.) He also asserts that the seatbelt in the Jimmy should have been equipped with a locking latch plate and a rollover sensor that "fully locks the seatbelt for the duration of the rollover, by means of a pretensioner or other non-inertial mechanism." (Id.) Dr. Pugh observes that Campbell's seatbelt likely unlocked and unspooled throughout the rollover, providing too much slack and failing to keep her properly secured. (Id.)

III.  **Jurisdiction and Standard of Review**

The court's jurisdiction is premised on 28 U.S.C. § 1334(b), which grants the district courts original jurisdiction over all "civil proceedings arising under title 11, or arising in or related to cases under title 11." A civil proceeding is "related to" bankruptcy when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re* Guild and Gallery Plus, Inc., 72 F.3d 1171, 1180-81 (3d Cir. 1996) (quotation marks omitted). Section 1334(b)'s grant of jurisdiction is broad, extending to any proceeding that "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of

the bankrupt estate." Id. Campbell seeks significant money damages against GM, and it is certainly "conceivable" that the outcome of this litigation will affect the bankruptcy estate. Hence, the jurisdictional requirements of § 1334(b) are satisfied.

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

**IV.**    **Discussion**

Before the court presently are GM's motions for summary judgment and for partial summary judgment, and Campbell's motion for partial summary judgment. The court will address each in turn.

A.    GM's Motion for Summary Judgment

GM advances three arguments in support of its motion for summary judgment. First, GM argues that Campbell's proffered expert opinion testimony is inadmissible under Federal Rule of Evidence 702, because her experts failed to engage in testing to support their hypotheses. Second, because Campbell's expert testimony is inadmissible, she is unable to show that she suffered "enhanced injuries," as required under Pennsylvania products liability law. Third, GM argues that Campbell lacks admissible expert testimony sufficient to show that an alternative design would have prevented the Jimmy from rolling over. GM does not engage in an in-depth challenge of any of Campbell's experts, but rather broadly attacks the reliability of all of the experts because they did not engage in sufficient testing.

Pennsylvania applies strict liability against sellers who release defectively designed or manufactured products into the stream of commerce. <u>Walton v. Avco</u>

<u>Corp.</u>, 610 A.2d 454, 458 (Pa. Super. 1992).[2]  The doctrine of "crashworthiness" as a

"subset" of products liability.  <u>Kupetz v. Deere & Co., Inc.</u>, 644 A.2d 1213, 1218 (Pa.

Super. 1994) (recognizing the implicit adoption of the crashworthiness doctrine by

the Pennsylvania Supreme Court in <u>McCown v. Intern'l Harvester Co.</u>, 342 A.2d 381

(Pa. 1975)).  Crashworthiness is sometimes referred to as the "second collision"

doctrine.  The second collision concept, at least with regard to automobile

accidents, refers to the vehicle occupant's collision with the interior of the vehicle,

or with the ground if the occupant is ejected.  <u>Id.</u>  The theory is that although the

alleged defect was not the cause of the actual accident, the defect exacerbated the

plaintiff's injuries.

　　To prevail on her crashworthiness claim, Campbell must prove three

elements.  First, she must show that the vehicle design was defective, and that at

the time that the vehicle was designed a safer alternative existed that was

_____

[2] The court is aware that there exists some ambiguity as to whether
Pennsylvania will continue to apply the law of strict products liability formulated in
§ 402A of the Restatement (Second) of Torts, or will adopt the analysis of §§ 1 and 2
of the Restatement (Third).  <u>See</u> <u>Covell v. Bell Sports, Inc.</u>, 651 F.3d 357, 362 (3d Cir.
2011).  The Third Circuit has predicted that the Pennsylvania Supreme Court, if
confronted with the question, would adopt the Restatement (Third), <u>Berrier v.
Simplicity Mfg., Inc.</u>, 563 F.3d 38, 40 (3d Cir. 2009), and in the absence of a definitive
ruling from the Pennsylvania Supreme Court, this court is bound by the Third
Circuit's determination.  <u>Covell</u>, 651 F.3d at 362.  However, the ambiguity may soon
be resolved because the Pennsylvania Supreme Court recently granted allocatur in
<u>Tincher v. Omega Flex, Inc.</u>, — A.3d —, 2013 WL 1222123 (Pa. March 26, 2013) (per
curiam), to address whether the Third Restatement analysis should be adopted.
　　Neither party has raised this issue, and the court will not do so unprompted.
Whether, and to what extent, Campbell's crashworthiness claim differs under §
402A of the Restatement (Second) or §§ 1 and 2 of the Restatement (Third) is a
question that will be left for another day.

practicable under the circumstances.  Id.  Second, Campbell must identify what

injuries, if any, she would have received had the safer alternative been

implemented.  Gaudio v. Ford Motor Co., 976 A.2d 524, 532 (Pa. Super. 2009).  Third,

she must identify what injuries she suffered as a result of the defect.  Id.  Campbell

must support her claims with expert testimony.  See Jones v. Toyota Motor Sales,

USA, Inc., 282 F. Supp. 2d 274, 277-78 (E.D. Pa. 2003); see also Huddell v. Levin, 537

F.2d 726, 737 (3d Cir. 1976) (recognizing that "unlike orthodox products liability . . .

litigation, crashworthy or second collision cases impugning the design of a product

require a highly refined and almost invariably difficult presentation of proof");

Andrews v. City of Pittsburgh, 41 Pa. D. & C.3d 520, 526 (Pa. Ct. of Common Pleas

1984).

　　　The admission of expert testimony in federal court is governed by Federal

Rule of Evidence 702, which states:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient facts or data, (2)
> the testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts
> of the case.

FED. R. EVID. 702; see also Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316,

321 (3d Cir. 2003) (explaining that the Rule 702 requirements constitute "the 'trilogy

of restrictions on expert testimony: qualification, reliability and fit'" (quoting

Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).  Rule 702 requires district court

judges to act as "gatekeepers" to ensure that expert testimony is both reliable and relevant, see Daubert v. Merrell Dow Pharmaceuiticals, Inc., 509 U.S. 579, 589 (1993), but courts nonetheless must adopt a "liberal policy of admissibility," and favor the admission of any evidence that may assist the trier of fact, Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008).

GM asserts that the methodologies employed by Campbell's proffered experts are not "reliable." With respect to this prong of the analysis, the Third Circuit has held that "'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" Id. at 244 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994)). The party offering expert testimony must make "more than a prima facie showing" of reliability, but "'[t]he evidentiary requirement of reliability is lower than the merits standard of correctness.'" Id. at 247 (quoting Paoli, 35 F.3d at 744). Factors that a court may consider in assessing the reliability of expert testimony include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. at 247-48. These factors are intended to be "helpful, not definitive," and not all factors will necessarily apply in any given case. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999).

19

The gravamen of GM's argument is that none of Campbell's experts conducted a roll test of a 1996 Jimmy with their proposed design improvements using instrumented crash-test dummies. They therefore do not know whether such improvements could have prevented Campbell's injuries, rendering their opinions unreliable and inadmissible. This argument is unpersuasive.

GM relies heavily on Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000). The plaintiff in Oddi was driving a bread truck on a highway when he struck a guardrail and bridge abutment, crushing his legs so completely that they had to be amputated. Id. at 141. The basic components of the truck he was driving – the frame rails, axles, engine, drive train, wheels, and front bumper – were manufactured and assembled by Ford, and then modified by a third party for use as a bread delivery truck. Id. Oddi brought claims of Pennsylvania strict liability, negligence, breach of warranty and failure to warn against both Ford and the third party, Grumman. Id. He retained an engineer to testify as an expert on the alleged manufacturing and design defects of the truck, and a biomechanist to testify as an expert on how Oddi suffered his injuries. The district court granted summary judgment to Ford on the grounds that neither expert met the admissibility standards of Daubert. Id.

The Third Circuit affirmed. The court began its analysis by discussing some of the factors that will guide a court's inquiry into the relevance and reliability of proffered expert testimony. These factors include whether the theory can and has been tested; whether the theory has been subjected to peer review and publication;

20

what the potential or known rate of error is for the particular scientific technique at issue; and whether the technique has been generally accepted by the relevant scientific community. Id. at 144-45. Importantly, however, the court emphasized that the standard under Rule 702 is not a high one, and does not require plaintiffs "to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." Id. at 145 (internal quotation marks omitted).

The court then discussed the testimony proffered by the two experts. Oddi's design engineer would testify that the design of the left front bumper of the truck was defective because it was not reinforced by a backing plate or brackets, allowing it to deform backward and inward when the truck hit the guardrail, which ramped the truck onto the rail rather than deflecting it away. Id. at 146-47. He also posited that the flooring of the cab should have been thicker or reinforced with ribbed metal to strengthen the integrity of the cab. Id. But Oddi's expert was unable to identify any specific literature upon which he relied to formulate his opinions. Id. at 148. He had not evaluated the force the truck inflicted on the guardrail or the bridge abutment at the time of impact, and had not measured the strength or rigidity of the guardrail. Id. at 149. Nor had he determined how much force the bumper could sustain before it bent. Id. Finally, the expert had not tested or substantiated any of the proposed design modifications that he suggested. Id. at 149. Oddi's biomechanist was similarly unable to provide information on how he

had arrived at his opinions, stating that he could not determine what injuries Oddi would have suffered in the absence of the alleged design flaws.  Id. at 150-51.

In evaluating the engineer's testimony, the Third Circuit found that he satisfied *none* of the factors discussed in Paoli II.  Not only had the engineer failed to test his hypotheses, Oddi could not even identify what methodology and research supported the hypotheses.  See id. at 156 (noting that the engineer "testified that he had 'studied' bread trucks but was not able to state if they were the same kind of truck that Oddi was driving or even if they were produced by the same manufacturer").[3]

Campbell's proffered expert testimony is worlds away from that offered in Oddi.  Dr. Nash uses established systems analysis techniques to form his opinion,

_____

[3] Oddi's engineering expert had, for all intents and purposes, conducted no research, as exemplified by this passage from his deposition:

> Q: What type of vehicles [did you examine]?
> A: Bread trucks.
> Q: Whose bread trucks? Who made them?
> A: They were in front of a grocery store and I walked up and looked at them. I didn't record anything off of them.  I seen them [i.e., bracketry or wedge supports] on them [i.e., front bumpers].
>
> . . .
>
> Q: You didn't make a note of what the bread truck was so you could go back and say, "Here's the design I'm proposing and somebody is already using this."
> A: I said that in my mind, and I had groceries and I didn't have a camera and nothing else.

Id. at 156-57 (alterations in original).  The engineer's research largely amounted to glancing at a bread truck while he was grocery shopping.

evaluating "crash statistics, vehicle dynamics, occupant kinematics, injury susceptibility and mechanism, crashworthiness, and occupant protection." (Nash Report, Doc. 19-8 at 1-2). He examines a number of materials, including those published in peer-reviewed journals. (Id. at 43-49). Most importantly, however, Dr. Nash relies on the M216 test conducted on a 1995 Chevrolet Blazer S-10, a vehicle that has the same roof structure as the 1996 Jimmy, and concludes that the roof could not "even support the weight of the vehicle." (Id. at 14). He also evaluates alternative designs, as used in the Volvo XC-90, Honda CR-V, Volkswagen Jetta, and the Toyota Camry, and concludes that they performed "dramatically better" than the Jimmy in roof crush tests. (Id. at 16).

Dr. Freeman provides significant details on the source of the data he drew upon for his statistical analysis on the risk of suffering a significant head or neck injury during a rollover in which the roof collapses. He posits that:

> [T]he most probable explanation for the cervical spine and spinal cord injuries sustained by Callan Campbell in the August 17, 2004 rollover collision was the degree of dynamic and static roof crush inferred/observed in the 1996 GMC Jimmy in which she was a right front seat passenger at the time of the collision. Specifically, there is a risk ratio of > 8.0 (> 800% risk) for Callan Campbell's injuries related to the degree of roof crush sustained by the GMC.

(Freeman Report, Doc. 19-14 at 54). GM's complaint that Dr. Freeman "did not even inspect the vehicle," (Doc. 19 at 18 n.5), is wholly immaterial: Dr. Freeman conducted a statistical analysis of the likelihood of obtaining the types of injuries Campbell suffered when involved in the type of rollover collision in which she was involved. He examined data from hundreds of crashes and compared it to damage

information about the Jimmy that he obtained from Dr. Nash's report.  (See Freeman Report, Doc. 19-13 at 8 ("My understanding of the relevant facts in this [case] is from my review of the April 16, 2009 preliminary report by Dr. Nash.")).  It is difficult to conjure how a first-hand examination of the Jimmy would have altered or improved Dr. Nash's analysis.

Dr. Pugh examined the Jimmy and studied the reports of Drs. Nash and Perrone, and Schorr.  (Pugh Report, Doc. 19-7 at 2).  He also reviewed Campbell's medical records, the accident site, and the police report.  (Id.)  In his expert report, he describes the biomechanical limits to the elasticity of the head, neck, thorax, and lumbar spinal anatomy, and determines after having viewed the Jimmy that the roof intrusion over Campbell's seat would have subjected her to as much as twice as much dynamic deflection as her body could withstand.  (Id. at 3).  Similarly, Dr. Perrone observed the crash location, and took measurements in order to reconstruct the accident scene.  (Perrone Report, Doc. 19-5 at 4).  He observed the different degrees of roof crush over Campbell's seat in the Jimmy compared to Fawber's and Maurer's, as well as the differences in height and weight of Campbell, Maurer, and Fawber.  (Id. at 5).  Dr. Perrone states that SSF is "an important and reliable indicator for rollover propensity" according to the NHTSA and the National Academy of Sciences, and that the NHTSA had conducted tests and found that vehicles with SSFs of 1.17 or greater were "almost impossible to . . . overturn on the highway with emergency maneuvers."  (Id. at 6).  The Jimmy had an SSF of 1.09, which Dr. Perrone asserts contributed to Campbell's injuries.  (Id.)

GM's fundamental argument is that none of Campbell's experts conducted a test wherein they modified a 1996 Jimmy with a strengthened roof, placed into the vehicle instrumented crash-test dummies to measure neck load or other indicia of injury, and then applied force to the vehicle's roof to determine whether Campbell would have been injured. Rule 702 does not impose such a demanding standard. To do so would require plaintiffs "to prove their case twice." <u>Oddi</u>, 234 F.3d at 145. Rather, Rule 702 imposes a "flexible" standard for the admissibility of expert testimony, <u>see</u> <u>Daubert</u>, 509 U.S. 579, 594-95 (1993), where no single factor is dispositive, <u>Oddi</u>, 234 F.3d at 145. Indeed, the Supreme Court specifically held that the factors enunciated in <u>Daubert</u> are not a "definitive checklist or test." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999).

Campbell's experts engaged in significant research and data-driven statistical analysis. Their reports are neither conjecture nor speculation, and rely upon generally accepted methodologies of systems and statistical analysis. To the extent that GM challenges the accuracy of their conclusions, such a challenge simply goes to the weight of the evidence rather than its admissibility. <u>See</u> <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802, 809 (3d Cir. 1997) (noting that the test is not whether "the expert might have done a better job"). GM may appropriately explore its concerns about accuracy on cross-examination.

As Campbell correctly notes, GM has not challenged the sufficiency of the evidence to survive summary judgment, outside of its argument regarding admissibility. Accordingly, having rejected GM's argument on this point, the court will deny GM's motion for summary judgment.

B.     Campbell's Motion for Partial Summary Judgment on Causation

Campbell moved for partial summary judgment on the issue of causation. She asserts that GM has failed to produce evidence in support of its "diving" theory of causation – that Campbell's injuries were not caused by roof collapse, but instead by Campbell's body colliding with the roof during the roll. For the reasons to be discussed, the court concludes that a genuine dispute of material fact exists as to the cause of Campbell's injuries, and therefore her motion for partial summary judgment will be denied.

A brief discussion of the parties' competing theories is warranted before proceeding to the merits. Campbell postulates, as has been thoroughly discussed *supra*, that her injuries were caused by intrusion of the Jimmy's roof into the passenger cabin as the vehicle rolled, and that if the roof had been designed with a higher SWR, her injuries would have been less serious or perhaps even nonexistent. GM's theory, supported in part by its biomechanical expert Dr. Debora Marth, is that Campbell fractured her C6 and C7 vertebrae when her "head (augmented by her torso) . . . [struck] the right roof rail/roof panel area when that part of the roof impacted the ground . . . [and that] the significant deformation of the roof occurred after the injury." (Doc. 24 at 5 (internal quotation marks and emphasis omitted)).

26

GM's theory may generally be referred to as a "diving" or "torso augmentation" theory of injury, meaning that Campbell "dove" into the roof.

Campbell argues that the NHTSA has "conclusively determined" that vehicle roof crush causes the types of injuries that she suffered, and that this finding forecloses GM's diving theory of causation. (<u>See generally</u> Doc. 6). In support of her position, Campbell recounts a lengthy history of the development of NHTSA's roof crush standard, including some of the research that the NHTSA relied on in formulating the standard. She also cites her own expert reports to support her argument that in this case, and in rollover accidents more broadly, roof crush can cause the type of head and neck injuries that she suffered in the rollover. However, Campbell's lengthy motion amounts simply to arguing the weight of the evidence, an issue which is inappropriate for resolution under Federal Rule of Civil Procedure 56.

Campbell refers to a notice of proposed rulemaking ("NPRM"), published by the NHTSA in 2005. <u>See</u> Federal Motor Vehicle Safety Standards; Roof Crush Resistance, 70 Fed. Reg. 49223 (proposed Aug. 23, 2005). The NHTSA proposed increasing the required roof SWR from 1.5 times the weight of the vehicle, to 3 times its weight, and to extend the standard to those vehicles with a gross vehicle weight rating ("GVWR") of between 6,000 and 10,000 pounds. The agency discussed a 1994 study conducted to consider if roof intrusion was related to the severity of occupant injury, and observed that the study found a "relationship between the amount of roof intrusion and the risk of injury to belted occupants in rollover

events." Id. at 49231; see also id. at 49229 (observing that "some occupants" that

sustained injuries in crashes where the vehicle rolled more than one-quarter turn

or end-over-end "could potentially benefit from upgrading the roof crush resistance

requirements"). Importantly, the NHTSA did not find that roof crush was the

exclusive cause of head and neck injuries in rollover crashes, nor did it categorically

exclude diving or torso augmentation as a potential cause of injury.

The NHTSA promulgated a final rule on May 12, 2009, and addressed

comments offered by the automobile industry on the causal relationship between

roof crush and serious injury. Federal Motor Vehicle Safety Standards; Roof Crush

Resistance; Phase-In Reporting Requirements, 74 Fed. Reg. 22348, 22378-79 (final

rule promulgated May 12, 2009) (codified at 49 C.F.R. §§ 571, 585). Auto

manufacturers criticized the agency's reliance on a study that linked roof intrusion

and serious injury, and commented that a statistical correlation did not establish a

causal relationship between the two. Id. The agency agreed, to an extent,

acknowledging that "as a general principle, a statistical correlation does not in itself

prove that a causal relationship exists." Id. at 22379. The agency further stated:

> There are logical reasons to believe that a collapsing roof that strikes
> an occupant's head at the nearly instantaneous impact velocity
> experienced when structures deform might cause serious injury. . . .
> The agency believes that the statistically significant relationship
> between roof intrusion and belted occupant injury found in the
> Strashny [roof intrusion] study indicates not just a suggestion, but a
> probability that increasing roof strength reduces injuries.

Id. Nothing contained in the agency's response suggests that the final rule

categorically excluded torso augmentation or diving as a cause of head and neck

injury in a rollover crash.  To the contrary, the NHTSA's response was resolutely

probabilistic.  Furthermore, Campbell has shown nothing in the NHTSA's

regulations that would suggest that the agency's study of roof crush injuries could

prevent a party from presenting at trial evidence of an alternative explanation.[4]

Campbell's assertion that GM's diving theory has been foreclosed by the NHTSA is

therefore without merit.

In support of her motion, Campbell relies upon a report from the Insurance

Institute for Highway Safety ("IIHS"), her own experts' reports, and a rollover

crash study conducted by the Accident Research Center.  (See, e.g., Doc. 12 at 19-20

(discussing an IIHS report stating that the "association between vehicle roof

strength and occupant injury risk in rollover crashes appears robust across

different vehicle groups and across roof SWR values"); id. at 21 (report of Dr.

Perrone that "the Jimmy is among the worst of all possible vehicles regarding roof

strength")).  Despite the volume of evidence that she has amassed in her favor, GM

---

[4] Campbell asserts that the NHTSA's conclusion that roof crush is a cause of injury is entitled to deference under Chevron v. National Resources Defense Council, 467 U.S. 837 (1984).  In Chevron, the Supreme Court held that courts must give deference to an agency's reasonable interpretation of the statute that it administers.  Id. at 842-43; see also Swallows Holding, Ltd. v. C.I.R., 515 F.3d 162, 167 (3d Cir. 2008) ("In Chevron, the Supreme court reasoned that the judiciary was to afford an agency discretion to interpret ambiguous provisions of the agency's organic or enabling statute.").  The court disagrees with Campbell's argument that the NHTSA conclusively determined that roof crush is the *exclusive* cause of head and neck injury in rollover collisions and, therefore, it is unnecessary to address her Chevron argument.

has produced contrary evidence.  It is the province of the jury to determine the merits of the parties' competing theories.

GM's evidence includes the report of its biomechanical expert Dr. Marth, who concludes:

> Callan Campbell's head was close to or in contact with the right roof rail/roof panel area when that part of the roof impacted the ground. Specifically, the high left parietal area of her head was near the rear portion of the roof rail and grab handle.  When this occurred, her buttocks were not compressing the seat cushion.  With her head and the roof stopped on the ground, her torso, in accordance with the laws of physics, continued toward the ground producing a compressive load to her neck.  The compressive load caused her cervical spine to buckle, with portions subjected to local flexion and portions subjected to local extension. . . . The significant deformation of the roof occurred after the injury.

(Expert Report of Dr. Debora Marth, Doc. 24-1 at 11-12).  Dr. Marth opines that, while the Jimmy was rolling, Campbell "would have moved up and out in response to centrifugal force."  (Id. at 10).  Campbell would have moved off of her seat, and when the vehicle roof impacted the roadway "her head would have essentially been stopped on the ground with the roof in between."  (Id.)  Dr. Marth's report creates a triable issue of fact as to whether Campbell's injuries were caused by roof crush, or by Campbell "diving" in to the roof.

Campbell argues in the alternative that even if the court accepts the plausibility of GM's diving theory, summary judgment in Campbell's favor is warranted because GM contends that she suffered a compression fracture, and her "teardrop" fracture is not a form of compression fracture.  Again, Campbell's argument is thwarted by factual issues that must be determined by the jury.  GM's

30

experts plainly contradict her assertion that a "teardrop" fracture cannot be caused by a compressive load on the neck. In his expert report, GM witness Dr. Robert Nightingale describes the type of injury that Campbell sustained:

> The CT of her neck showed bilateral jumped facets at C6-C7 with an associated teardrop fracture of C7. . . . There were also some bony fragments posterior to C6. According to the MRI, there was cord compression and contusion at C6-7, damage to the posterior ligaments, and bleeding anterior to the vertebral bodies. All these are consistent with the total joint disruption that is characteristic of bilateral facet dislocations.

(Expert Report of Dr. Robert Nightingale, Doc. 24-5 at 4). Dr. Nightingale then explains that the "mechanism for the bilateral facet dislocation is now understood to be caused by local shear and bending *secondary to neck compression and buckling*." (Id. at 5 (emphasis added)). He concludes that when the Jimmy landed on its roof, "both the roof and Ms. Campbell's head were abruptly stopped and her cervical spine was subjected to the kinetic energy of her torso. Within 15 milliseconds, the inertia of her body fractured her neck." (Id. at 6). He opines that Campbell suffered "a classic compression-flexion neck injury at one of the most commonly injured levels of the cervical spine." (Id.) Thus, GM has produced evidence that the type of "teardrop" fracture suffered by Campbell may be caused by compression forces acting on the cervical spine.

As a final argument, Campbell asserts that it is "undisputed" that she tucked her head, neck, and back in toward the driver's seat as the Jimmy rolled, and that in this position, her injuries could not have been caused by torso augmentation. (Doc. 12 at 44). Campbell refers to a portion of the deposition of Jeffrey Croteau,

31

GM's corporate designee, who when questioned about whether Campbell could have sustained a diving injury if she had tucked her head and neck in, stated:

> I would say that if we were to – first of all, I believe that she remembers that she was to the left and I believe that that particular memory is during the trip phase, okay, and then the vehicle rotates around her. . . . If that's the case, then she is not going to be aligned such that she is projected through torso augmentation into the roof with the velocity and in orientation that will yield the compressive load on the neck that I understand would case a cervical spine to fracture.

(Dep. of Jeffrey Croteau, Doc. 24-4 at 4). Campbell suggests that this statement is a concession that Campbell was in a position in which she could not have suffered a compression fracture, and that GM has adduced no other evidence to refute this concession. Both assertions are plainly incorrect. First, Mr. Croteau's response *assumes*, for the purpose of a hypothetical question, that Campbell's recollection is *correct*; he is not conceding that it is. Second, Dr. Marth opines in her report that centrifugal force would have moved Cambpell's body upward and outward, striking her head against the roof. (Expert Report of Dr. Debora Marth, Doc. 24-1 at 10). Finally, as GM correctly points out, Campbell's recollection of her body position is refuted by her own experts. Dr. Pugh, Campbell's biomechanical expert, testified at his deposition that "I don't believe her butt was necessarily securely in the seat because I believe there was some seat belt slack. And she said that she was – she had tried to bunch herself up or something. I – I don't – I don't think she was able to curl herself up into a ball. She wasn't – you know, just – just wasn't enough time to do that." (Dep. of Dr. James Pugh, Doc. 24-2 at 3). Contrary to Campbell's assertions, a material factual dispute exists as to her body position during the

rollover accident. This issue is therefore inappropriate for resolution on a motion for summary judgment.

In the alternative, Campbell requests that the court preclude GM from offering evidence in support of its diving theory at trial, on the grounds that the theory has been "thoroughly debunked," and because the theory is premised on existence of a compression fracture, which is not the type of fracture that Campbell suffered. (Doc. 12 at 48). For the reasons discussed with respect to Campbell's motion for partial summary judgment, the court deems it inappropriate to preclude GM from presenting evidence in support of its theory.

For the reasons previously discussed, there exists a genuine dispute of material fact as to the cause of Campbell's injuries, and therefore she is not entitled to judgment as a matter of law. Accordingly, Campbell's motion for partial summary judgment on the issue of causation will be denied.

C.      GM's Motion for Partial Summary Judgment on Punitive Damages

GM filed a motion for partial summary judgment on Campbell's claim for punitive damages. GM argues that Michigan law governs Campbell's claim for punitive damages, and that because Michigan law precludes recovery of punitive damages against manufacturers of consumer products, Campbell's request for punitive damages must be dismissed. As alternative arguments, GM asserts that equity compels enjoining punitive damages because GM is a liquidating debtor, and punitive damages would pointlessly deplete GM's resources for subsequent

creditors, and that in any event, Campbell has failed to produce evidence sufficient to create a disputed issue of material fact as to punitive damages.

      i.     *Choice of Law Rules*

Before determining whether the court should apply Pennsylvania or Michigan law governing punitive damages, the court must determine what choice of law rules apply. Federal courts sitting in diversity are obliged to apply the choice of law rules of the forum state, i.e., the state in which the district court sits. <u>See LeJeune v. Bliss-Salem, Inc.</u>, 85 F.3d 1069, 1071 (3d Cir. 1996). However, the court's jurisdiction in this case is not premised on diversity of citizenship of the parties, as both Campbell and Fawber are citizens of Pennsylvania. Rather, the court's jurisdiction is conferred pursuant to 28 U.S.C. § 1334(b), which grants the district courts original – but not exclusive – jurisdiction over all "civil proceedings arising under title 11, or arising in or related to cases under title 11."

Courts are split as to whether a federal court sitting in bankruptcy is required to apply the choice of law rules of the forum in which it sits, or federal choice of law rules, a species of federal common law. <u>See</u> 19 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 4518 (2d ed. 1987) (database updated Dec. 2012); <u>see also</u> <u>*In re* Gaston & Snow</u>, 243 F.3d 599, 605 (2d Cir. 2001). In <u>*In re* Lindsay</u>, 59 F.3d 942, 948 (9th Cir. 1995), the Ninth Circuit held that in "federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules." The court further reasoned that the need to avoid forum shopping between state

34

and federal courts, which counsels in favor of applying state law, is not implicated in matters where federal courts have exclusive jurisdiction.  Id.; accord In re Vortex Fishing Systems, Inc., 277 F.3d 1057, 1069 (9th Cir. 2002) ("In a bankruptcy case, the court must apply federal choice of law rules."); Wallace Lincoln-Mercury Co., Inc. v. Gentry, 469 F.2d 396, 300 (5th Cir. 1972).  In the Third Circuit, the Bankruptcy Court for the Eastern District of Pennsylvania has held that when a dispute involving federal substantive law arises in bankruptcy litigation, federal common law principals will govern.  In re August, 448 B.R. 331, 348 (Bankr. E.D. Pa. 2011).

Other courts have disagreed, extending to bankruptcy cases the holding of Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496-97 (1941), which held that when sitting in diversity, a federal court must apply the conflict of laws rules of the state in which it sits.  In re Merritt Dredging Co., Inc., 839 F.2d 203 (1988), the Fourth Circuit addressed whether the law of South Carolina or of Louisiana governed determination of the property rights in the assets of a bankrupt estate.  Id. at 205.  The court noted that the "Klaxon rule rested on the rationale that a federal court, in determining state law issues which arise in federal court only by the accident of diversity, must apply state law, including state conflict of law rules, to those issues."  Id.  Applying forum state rules governing conflicts of law would be in accordance with the principles underlying both Klaxon and Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), which made clear that "federal law may not be applied to questions which arise in federal court but whose determination is not a matter of federal law."  See In re Merritt, 839 F.2d at 206; id. ("[e]xcept in matters

35

governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." (quoting <u>Erie</u>, 304 U.S. at 78)); <u>id.</u> ("It would be anomalous to have the same property interest governed by the laws of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy."); <u>accord</u> <u>*In re* Gaston & Snow</u>, 243 F.3d 599, 607 (2d Cir. 2001) (agreeing with the Fourth Circuit and holding that "bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state").

The matter at bar differs somewhat from both lines of authority. First, unlike <u>*In re* Merritt</u>, this case could not have originated in federal court as a diversity action, because the parties are not completely diverse of citizenship. <u>See</u> <u>*In re* Merritt</u>, 839 F.2d at 206. Second, this case does not arise out of bankruptcy proceedings *per se*, but rather has been removed to federal court based upon the court's ability to hear cases "related to" a bankruptcy. <u>See</u> U.S.C. § 1334(b). However, even with these distinctions in mind, the court is persuaded by the reasoning of the Fourth and Second Circuits, and will apply forum state choice of law rules.

Several justifications undergird the court's holding. First, as the Fourth Circuit trenchantly observed in <u>*In re* Merritt</u>, the rule in <u>Klaxon</u> was predicated on the notion that something as fortuitous as "the accident of diversity" should not stop a federal court from applying state conflicts rules. 839 F.2d at 205. This matter arrived in federal court by a path equally as accidental as diversity. The parties

litigated this case in the Court of Common Pleas of Lackawanna County for several years before removal. Campbell filed her complaint on August 31, 2005. When GM filed for bankruptcy on June 1, 2009, the case was automatically stayed, and remained so until May 31, 2011, when the bankruptcy court lifted the stay. Only then did a basis for federal court jurisdiction arise, upon which GM removed. But for the bankruptcy filing, this matter would have been resolved by Pennsylvania state courts.

Second, the claims in this case arise exclusively out of Pennsylvania law. Campbell alleges state law negligence against Fawber (Count I), and state law strict liability and negligence against GM (Counts II and III, respectively). It is for this reason that the court's holding is not in tension with our sister district's decision in *In re* August, 448 B.R. 331, 347-48 (Bankr. E.D. Pa. 2011). There, the court was required to decide whether an unpaid line of credit from a casino could be discharged by a debtor in bankruptcy under 11 U.S.C. §§ 523(a)(2) and (6), when Pennsylvania and New Jersey laws differed as to whether gambling debts could be enforced. The court recognized that state law generally determines whether a debt is enforceable against a debtor. 448 B.R. at 347. Whether the debt was enforceable directly implicated an issue of federal substantive law, because if the obligation was unenforceable, then there was no "debt" that could be discharged under 11 U.S.C. § 523(a). The litigation involved a dispute arising out of federal substantive law, and

therefore federal choice of law rules governed.  Id. at 348.  No such federal substantive concern is implicated in the instant matter because the claims that Campbell brings arise wholly out of state law.

Third, the facts of the instant matter are distinguishable from the facts of *In re* Lindsay, 59 F.3d 942 (9th Cir. 1995).  There, the Ninth Circuit held that "in federal question cases *with exclusive jurisdiction* in federal court, such as bankruptcy," federal choice of law rules should apply.  Id. at 948 (emphasis added).  When a case can *only* be litigated in federal court, the concern against forum shopping does not apply.  Id.  This rationale is not implicated in the instant matter.  District courts have concurrent jurisdiction with state courts over matters "related to" bankruptcy.  28 U.S.C. § 1334(b) ("the district courts shall have original but not exclusive jurisdiction" over matters "related to" a bankruptcy).  Thus, concerns arising from possible forum shopping are not ameliorated in the instant matter by exclusive federal jurisdiction.

For all of these reasons, the court is persuaded that Pennsylvania's choice of law rules, rather than federal common law, must govern the court's analysis.

ii.     *Whether Pennsylvania or Michigan Law Regarding Punitive Damages Applies*

Pennsylvania's choice of law methodology is a flexible approach, combining "contacts" analysis and "interest" analysis.  See Kelly v. Ford Motor Co., 933 F. Supp. 465, 467-68 (E.D. Pa. 1996); see also Carrick v. Zurich-American Ins. Group, 14 F.3d 907, 909-10 (3d Cir. 1994); Griffith v. United Air Lines, Inc., 203 A.2d 796 (Pa.

1964).  A threshold issue exists, however, as to whether a "true conflict' or a "false conflict" exists between the laws of the two jurisdictions.  A false conflict exists when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law."  <u>Lacey v. Cessna Aircraft Co.</u>, 932 F.2d 170, 187 (3d Cir. 1991).  By contrast, a "real" or "true" conflict exists when the interests of both jurisdictions would be impaired if its were law not applied.  <u>Id.</u> n.15.  If a true conflict exists, the court must determine which state has the greater interest in having its law applied; if a false conflict exists, then the court must apply the law of the state whose interests would be harmed.  <u>Id.</u>

Pennsylvania permits plaintiffs to collect punitive damages against defendants in order to deter outrageous conduct.  <u>See, e.g.</u>, <u>Weston v. Northampton Personal Care, Inc.</u>, — A.3d —, 2013 WL 474701, at *63-64 (Pa. Super. 2013). Michigan, on the other hand, prohibits the collection of punitive damages.  <u>See</u> <u>Fellows v. Superior Products, Co.</u>, 506 N.W.2d 534, 536 (Mich. Ct. App. 1993).  In <u>Kelly</u>, the Eastern District of Pennsylvania faced the identical issue presented here, namely, whether Pennsylvania choice of law rules required applying Michigan's prohibition on punitive damages to a products liability case arising out of an automobile accident.  The court reasoned that a true conflict existed because punitive damages are intended to punish the defendant for outrageous conduct, and Michigan's prohibition of punitive damages was intended to shield "Michigan-domiciled defendants from excessive financial liability."  <u>Kelly</u>, 933 F. Supp. at 468 (citing <u>In re</u> <u>Disaster at Detroit Metro. Airport on August 16, 1987</u>, 750 F. Supp. 793,

805 (E.D. Mich. 1989). The court agrees that a true conflict exists between Michigan and Pennsylvania law, and so a contacts and interest analysis must be performed.

Pennsylvania courts have turned to the Second Restatement of Conflict of Laws for guidance in evaluating a state's "contacts" with a case. Carrick, 14 F.3d at 909. These factors may include: (1) "the place where the injury occurred;" (2) "the place where the conduct causing the injury occurred;" (3) "the domicil, residence, nationality, place of incorporation and place of business of the parties;" and (4) "the place where the relationship, if any, between the parties is centered." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2). The contacts must be evaluated on a "qualitative rather than quantitative scale." Cipolla v. Shaposka, 267 A.2d 854, 857 (Pa. 1970).

Campbell asserts that a conflicts analysis is unnecessary, because GM has "voluntarily agreed to be subjected to Pennsylvania law to the same extent as if it were incorporated in Pennsylvania by choosing to conduct its business in the Commonwealth." (See Doc. 22 at 9). Campbell directs the court's attention to a Certificate of Authority to conduct business within Pennsylvania, issued to GM on December 29, 1941. (See Doc. 22-2). Pursuant to 15 PA. CONS. STAT. § 4142,

> A qualified foreign business corporation, so long as its certificate of authority is not revoked, shall enjoy the same rights and privileges as a domestic business corporation, but no more, and, except as in this subpart otherwise provided, *shall be subject to the same liabilities, restrictions, duties and penalties now in force or hereafter imposed upon domestic business corporations, to the same extent as if it had been incorporated under this subpart.*

40

Id. (emphasis added). Campbell argues that by holding a Certificate of Authority, GM has voluntarily subjected itself to Pennsylvania's laws, including the availability of punitive damages. The court disagrees.

As GM correctly observes, the purpose of a Certificate of Authority is to bring foreign corporations within the reach of legal process, as well as Pennsylvania's tax laws. Hoffman Const. Co. v. Erwin, 200 A. 579, 580 (Pa. 1938). A corporation is also required to hold a Certificate of Authority in order to maintain "any action or proceeding" in Pennsylvania. 15 PA. CONS. STAT. § 4141(a). However, nothing in Pennsylvania's Foreign Business Corporations Law suggests that issuance of a Certificate of Authority would supplant Pennsylvania's choice of law analysis. Rather, the issuance of a Certificate of Authority is simply one factor to be considered amongst others. See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)(c) (stating that a party's "domicil, residence, nationality, place of incorporation, and place of business" are relevant factors to consider in a choice of law analysis).

Campbell's reliance on Oil Shipping B.V. v. Sonmez Denizcilek Ve Ticaret A.S., 10 F.3d 1015 (3d Cir. 1993), is misplaced. In Oil Shipping, the Third Circuit recognized that, before engaging in a conflict of laws analysis, a court should first determine whether a statute preempts the analysis and dictates what law the court should apply. Id. at 1019. The court determined that the Ship Mortgage Act of 1920, ch. 250, 41 Stat. 1000 (1920) (codified as amended at 46 U.S.C. § 31301-31343), preempted a choice of law analysis to determine whether Turkish or American law

41

governed maritime mortgage lien priority.  Id. at 1023-24.  To reach this decision, the court relied extensively upon the Ship Mortgage Act's language and legislative history.  Id.  Notwithstanding Campbell's unsupported assertions to the contrary, Pennsylvania's Foreign Business Corporations Law does not evince legislative intent to preempt a traditional conflicts analysis.

In Kelly, the Eastern District of Pennsylvania reasoned that when the subject of a conflict of laws is punitive damages, the residence of the plaintiff and the location of the injury are not relevant contacts, because the purpose of punitive damages is not to compensate for injury but to punish and deter outrageous conduct.  Kelly, 933 F. Supp. 465, 469 (E.D. Pa. 1996).  Accordingly, the most relevant contacts are the location where the allegedly outrageous conduct took place, and the state of incorporation and principal place of business of the corporation involved.  Id. ("If the primary purpose of the tort rule involved is to deter or punish misconduct . . . the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship." (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. c)).

The relevant contacts weigh in favor of applying Michigan law on the issue of punitive damages.  GM is incorporated in Delaware, but maintains its principal place of business in Detroit, Michigan.  (Doc. 1 at 17); see § 145 cmt. e ("[A] corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter.").  GM "designed, engineered, and made all

42

of the significant decisions concerning the design and engineering" of the Jimmy in Michigan. (Affidavit of Carl Lange, Doc. 31 at 1). Campbell brings a defective design claim, which means that the place of the allegedly outrageous conduct was the state in which the Jimmy was designed – Michigan. Michigan therefore has the most relevant contacts under Pennsylvania choice of law rules.

With respect to the "interest" prong of Pennsylvania's choice of law analysis, Kelly is once again instructive. Michigan has a strong interest in "seeing that its domiciliary defendants are protected from excessive financial liability," in order that it may induce firms to conduct business within its borders. Kelly, 933 F. Supp. at 471. Pennsylvania has a valid interest in allowing punitive damages, in order that it may punish those whose outrageous conduct injure its residents, and deter others from acting similarly. RESTATEMENT (SECOND) OF TORTS § 908(1).

Pennsylvania and Michigan both have strong policy interests in having their punitive damages law applied to the instant matter. However, particularly in light of the unique purpose of punitive damages, Michigan has more significant contacts, and so Michigan law must be applied to this issue. The court's decision, however, is limited strictly to the issue of punitive damages. See Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006) ("Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'"); see also Taylor v. Mooney Aircraft Corp., 265 Fed. App'x 87, 91 (3d Cir. 2008) ("Although Pennsylvania courts have not explicitly addressed it, this Court has assumed that Pennsylvania's choice of law analysis

employs depecage. . . .").  Pennsylvania law will control for all remaining issues in this matter.

Michigan law governs on the issue of punitive damages, and Michigan law precludes the recovery of punitive damages.  Accordingly, GM's motion for partial summary judgment as to punitive damages will be granted.

**V.**     <u>**Conclusion**</u>

For the aforementioned reasons, the court will deny GM's motion for summary judgment and Campbell's motion for partial summary judgment, and will grant GM's motion for partial summary judgment.

An appropriate order will issue.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:        March 29, 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CALLAN CAMPBELL,** | : | **Civil Action No. 1:11-1215** |
| **Plaintiff,** | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | |
| **HOLLY F. FAWBER, and** | : | |
| **GENERAL MOTORS** | : | |
| **CORPORATION,** | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 29th day of March, 2013, upon consideration of the motions

for partial summary judgment, filed by defendant Motors Liquidation Company

GUC Trust (formerly known as General Motors Corporation, and hereinafter

referred to as "GM") (Doc. 14), and plaintiff Callan Campbell ("Campbell") (Doc.

11), and a motion for summary judgment (Doc. 17) filed by GM, and for the reasons

discussed in the accompanying memorandum, it is hereby ORDERED that:

1. GM's motion for summary judgment (Doc. 17) IS DENIED.

2. Campbell's motion for partial summary judgment (Doc. 11) is DENIED.

3. GM's motion for partial summary judgment on the issue of punitive damages (Doc. 14) is GRANTED.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge